# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE APPRAISAL OF DELL INC.       )      Consol. C.A. No. 9322-VCL

## MEMORANDUM OPINION

Date Submitted: May 11, 2015
Date Decided: July 13, 2015

Stuart M. Grant, Michael J. Barry, Christine M. Mackinstosh, Jennifer A. Williams, Rebecca A. Musarra, GRANT & EISENHOFER P.A., Wilmington, Delaware; *Attorneys for Petitioners Curtiss-Wright Corporation Retirement Plan; Manulife US Large Cap Value Equity Fund; The Milliken Retirement Plan; Northwestern Mutual Series Fund, Inc., on behalf of its Equity Income Portfolio; and T. Rowe Price Funds SICAV US Large Cap Value Equity Fund.*

Gregory P. Williams, John D. Hendershot, Susan M. Hannigan, Andrew J. Peach, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; John L. Latham, Susan E. Hurd, ALSTON & BIRD LLP, Atlanta, Georgia; Gideon M. Caine, ALSTON & BIRD LLP, East Palo Alto, California; Charles W. Cox, ALSTON & BIRD LLP, Los Angeles, California; *Attorneys for Respondent Dell Inc.*

**LASTER, Vice Chancellor.**

The petitioners are five institutions[1] who owned common stock of Dell, Inc. They sought appraisal after Dell announced a going-private merger. Dell contends that they did not hold their shares continuously through the effective date of the merger and therefore lost their appraisal rights.

The Funds held their shares through custodial banks. By virtue of this relationship, the Funds did not have legal title to the shares; they were beneficial owners. But the custodial banks did not have legal title either. The shares they held were registered in the name of Cede & Co., which is the nominee of the Depository Trust Company ("DTC").[2]

DTC's place in the ownership structure results from the federal response to a paperwork crisis on Wall Street during the late 1960s and early 1970s. Increased trading volume in the securities markets overwhelmed the back offices of brokerage firms and the capabilities of transfer agents. No one could cope with the burdens of documenting

---

[1] The five institutions are (i) the Northwestern Mutual Series Fund, Inc. Equity Income Portfolio ("Northwestern"), (ii) the Manulife US Large Cap Value Equity Fund ("Manulife"), (iii) the T. Rowe Price Funds SICAV US Large Cap Value Equity Fund ("T. Rowe Price"), (iv) the Milliken Retirement Plan ("Milliken"), and (v) the Curtiss-Wright Corporation Retirement Plan ("Curtiss-Wright"). Although three are "funds" and two are "plans," this decision refers to them as the Funds. The collective referent is purely for convenience.

[2] Technically, both the Funds and the custodial banks were "entitlement holders." This term defined is under Article 8 of the Delaware Uniform Commercial Code as a "person identified in the records of a securities intermediary as the person having a security entitlement against the securities intermediary." 6 *Del. C.* § 8-102(a)(7). The term "securities intermediary" means either "a clearing corporation," *i.e.* DTC , or "a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity," *i.e.*, the custodial banks. *Id.* § 8-102(a)(14).

stock trades using paper certificates. The markets were forced to declare trading holidays so administrators could catch up. With trading volumes continuing to climb, it was obvious that reform was needed. Congress directed the SEC to evaluate alternatives that would facilitate trading.

After studying the issue, the SEC adopted a national policy of share immobilization. To carry out its policy, the SEC placed a new entity—the depository institution—at the bottom the ownership chain. DTC emerged as the only domestic depository. Over 800 custodial banks and brokers are participating members of DTC and maintain accounts with that institution. DTC holds shares on their behalf in fungible bulk, meaning that none of the shares are issued in the names of DTC's participants. Instead, all of the shares are issued in the name of Cede. Through a Fast Automated Securities Transfer account (the "FAST Account"), DTC uses an electronic book entry system to track the number of shares of stock that each participant holds.

By adding DTC to the bottom of the ownership chain, the SEC eliminated the need for the overwhelming majority of legal transfers. Before share immobilization, custodial banks and brokers held shares through their own nominees, so new certificates had to be issued frequently when shares traded. With share immobilization, legal title remains with Cede. No new certificates are required.

Although the depository system solved the paperwork crisis, it complicated other aspects of the legal system. Appraisal is one of those areas. When a transaction triggers appraisal rights, Section 262 of the Delaware General Corporation Law (the "DGCL") permits "[a]ny stockholder of a corporation" who complies with its requirements to

litigate a proceeding that will result in a judicial determination of the "fair value of the shares." 8 *Del. C.* §§ 262(a) & (h). The statute states that "[a]s used in this section, the word 'stockholder' means a holder of record of stock in a corporation." *Id.* § 262(a) (the "Record Holder Requirement"). One of the statutory requirements is that a stockholder who wishes to pursue appraisal must "continuously hold[] such shares through the effective date of the merger." *Id.* (the "Continuous Holder Requirement").

Many appraisal decisions have involved disputes over these requirements. In one recurring scenario, companies argued that a petitioner had lost its appraisal rights when DTC followed its usual procedures, surrendered the shares held in fungible bulk for the merger consideration, and distributed the merger consideration to its participants, who then deposited it in their customers' accounts.[3] In *Alabama By-Products Corp. v. Cede & Co.*, 657 A.2d 254 (Del. 1995), the Delaware Supreme Court held that if a petitioner had

---

[3] *See, e.g., S. Prod. Co. v. Sabah,* 87 A.2d 128 (Del. 1952); *Roam-Tel P'rs v. AT&T Mobility Wireless Op. Hldgs. Inc.*, 2010 WL 5276991 (Del. Ch. Dec. 17, 2010) (Strine, V.C.); *Matter of Enstar Corp.*, 513 A.2d 206 (Del. Ch. 1986); *LeCompte v. Oakbrook Consol., Inc.*, 1986 WL 2827 (Del. Ch. Mar. 7, 1986); *Engel v. Magnavox Co.*, 1976 WL 1705 (Del. Ch. Feb. 5, 1976); *Abraham & Co. v. Olivetti Underwood Corp.*, 204 A.2d 740 (Del. Ch. 1964), *aff'd sub nom. Olivetti Underwood Corp. v. Jacques Coe & Co.*, 217 A.2d 683 (Del. 1966). *See generally* 1 R. Franklin Balotti & Jesse A. Finkelstein, The *Delaware Law of Corporations & Business Organizations* § 9.44, at 9-116 (3d ed. 2014) ("Prior to the Delaware Supreme Court's ruling in *Alabama By-Products Corp. v. Cede & Co.*, appraisal rights could be forfeited through any tender at any time, even if the tender was inadvertent and an appraisal petition had been filed." (footnote omitted)). The Delaware cases traditionally treated the receipt of the transaction consideration as something inadvertent. Under Article 8 of the UCC, a securities intermediary is required by law to "take action to obtain a payment or distribution made by the issuer of a financial asset" and is "obligated to its entitlement holder for a payment or distribution made by the issuer of a financial asset if the payment or distribution is received by the securities intermediary." 6 *Del. C.* § 8-505(a) & (b).

3

properly perfected its appraisal rights through Cede, then the petitioner would not lose its appraisal rights if DTC surrendered the shares in exchange for the merger consideration. The court reached this conclusion because the surrender did not comply with the appraisal statute's requirements for withdrawing or settling a properly perfected appraisal claim. The practical effect of this decision was to "impose upon the corporation the responsibility of overseeing the surrender of shares after a merger." *Id.* at 263.

To help issuers oversee the surrender of shares, DTC modified its procedures. Now, when a beneficial owner causes Cede to demand appraisal, DTC removes the shares covered by the demand from the fungible bulk tracked in the FAST Account. DTC does this by causing the issuer's transfer agent to issue a paper stock certificate for the number of shares held by the beneficial owner. The paper certificate is issued in Cede's name, so the same record holder continues to hold the shares for purposes of the Continuous Holder Requirement.

In this case, DTC followed its procedures and issued paper stock certificates in Cede's name for the Funds' shares. DTC then contacted the custodial banks to make arrangements for delivering the resulting valuable pieces of paper. But here another back-office procedure kicked in. For various understandable business reasons (insurance requirements, recordkeeping for internal audit, mitigating risk of theft, etc.), some banks and brokers only hold stock certificates that are issued in the names of their own nominees. The Funds' custodial banks followed this policy.

When DTC contacted the custodial banks, each instructed Dell's transfer agent to record a transfer of the shares to its nominee and issue a certificate in its nominee's name.

4

Dell's transfer agent complied. The Funds remained the beneficial owners. The custodians remained the custodians. But now there were new nominees on the stock ledger.

Dell has moved for summary judgment, arguing that these back-office steps resulted in new record holders and broke the chain of title for purposes of the Continuous Holder Requirement. Under Delaware cases that pre-dated the federal policy of share immobilization, the record holder for purposes of the DGCL was the person that appeared on the stock ledger. After the SEC created the depository system, the Delaware courts adhered to this rule. They did not distinguish the voluntary relationship between a client and its custodial bank or broker (the "broker level" of ownership) from the federally mandated relationship between the custodial bank or broker and DTC (the "depository level" of ownership). Delaware cases simply treated Cede as the holder of record and applied the Continuous Holder Requirement strictly. Under these decisions, the motion must be granted.

A different approach is possible and, in my view, preferable. Federal law looks through Cede and recognizes the custodial banks and brokers as record holders, just as before the federal mandate. If Delaware law took a similar approach, the Funds would retain their appraisal rights, because ownership by the relevant DTC participants never changed. Were I writing on a blank slate, I would account for the federal policy of share immobilization by interpreting the term "stockholder of record" as used in Section 262(a) to parallel its content under the federal securities laws. In other words, the term "stockholder of record" would include a DTC participant. But that is not how our cases

5

have interpreted the statutory term, and this court is bound by those precedents. Dell's motion for summary judgment is therefore granted.

## I.  FACTUAL BACKGROUND

The facts are drawn from the parties' submissions in connection with Dell's motion for summary judgment. There are no disputes of material fact about the Funds' exercise of their appraisal rights or the re-titling of their shares.

### A.  The Funds' Ownership Of Dell Shares

On February 5, 2013, Dell agreed to a merger in which each publicly held share of Dell common stock would be converted into the right to receive $13.75 in cash, subject to the right of stockholders to seek appraisal. The Funds held at least 922,975 shares of Dell common stock. Like most investors, the Funds did not hold legal title to their shares. The Funds owned the shares indirectly through accounts at custodial banks. Two of the Funds used J.P. Morgan Chase ("JP Morgan") as their custodian. The others used The Bank of New York Mellon ("BONY").

The custodial banks did not own record title either. JP Morgan and BONY are two of more than 800 custodial banks and brokers who are participating members of DTC.

> The vast majority of publicly traded shares in the United States are registered on the companies' books not in the name of beneficial owners— i.e., those investors who paid for, and have the right to vote and dispose of, the shares—but rather in the name of "Cede & Co.," the name used by The Depository Trust Company ("DTC").

> Shares registered in this manner are commonly referred to as being held in "street name." . . . DTC holds the shares on behalf of banks and brokers, which in turn hold on behalf of their clients (who are the underlying beneficial owners or other intermediaries).

John C. Wilcox, John J. Purcell III, & Hye-Won Choi, *"Street Name" Registration &*

*The Proxy Solicitation Process*, *in A Practical Guide to SEC Proxy and Compensation*

*Rules* 10-3, 10-3 (Amy Goodman et al. eds., 4th ed. 2007 & 2008 Supp.) [hereinafter

*Street Name*] (footnote omitted).

The history of how we arrived at this ownership structure is important and

informative.[4]

> Prior to 1970, negotiation was the most common method used to transfer
> stock in the United States. The owner would endorse the physical certificate
> to the name of the assignee on the back of the certificate. This endorsement
> instruct[ed] the corporation, upon notification, [about] the change in
> ownership of the shares on its corporate books. If the parties used the
> services of a broker, the seller would transfer the certificate to his brokerage
> firm. The brokerage firm representing the customer buying the security
> would receive the physical certificate and transfer it to the buyer as the new
> record owner of the security. Occasionally, the new owner might request
> that the physical certificate remain at the street address of the brokerage
> firm to facilitate the transfer of the certificate in a subsequent sale.

---

[4] A variety of sources provide consistent accounts of the origins of the depository system. *See, e.g.*, Securities and Exchange Commission, *Study Of Unsafe And Unsound Practices Of Brokers And Dealers*, H.R. Doc. No. 92-231, 92d Cong., 2d Sess. 9-10 (1971) [hereinafter *SEC Study*]; Uniform Commercial Code, Prefatory Note to Article 8 (revised 1994) [hereinafter *Prefatory Note*]; *Street Name* at 10-6 n.5; Teresa Carnell & James J. Hanks, Jr., *Shareholder Voting and Proxy Solicitation: The Fundamentals,* Maryland Bar Journal 23, 26 (Jan./Feb. 2004); David C. Donald, *Heart of Darkness: The Problem at the Core of the U.S. Proxy System and Its Solution*, 6 Va. L. & Bus. Rev. 41, 45, 50-61 (2011); Marcel Kahan & Edward Rock, *The Hanging Chads of Corporate Voting*, 96 Geo. L. J. 1227, 1237-38 & nn.45-50, 1273-74 (2008); Emily I. Osiecki, Alabama By-Products Corp. v. Cede & Co.*: Shareholder Protection Through Strict Statutory Construction*, 22 Del. J. Corp. L. 221, 223-28 (1997); Suellen M. Wolfe, *Escheat and the Challenge of Apportionment: A Bright Line Test To Slice A Shadow*, 27 Ariz. St. L.J. 173, 178-88 (1995); Businesses & Subsidiaries-The Depository Trust Company (DTC), http://www.dtcc.com/about/businesses-and-subsidiaries/dtc.aspx (last visited June 5, 2015).

Wolfe, *supra*, at 180 (footnotes omitted).

> Transfer of securities in the traditional certificate-based system was a complicated, labor-intensive process. Each time securities were traded, the physical certificates had to be delivered from the seller to the buyer, and in the case of registered securities the certificates had to be surrendered to the issuer or its transfer agent for registration of transfer.

*Prefatory Note* at 2.

By the late 1960s, increased trading rendered the certificate system obsolete. The paperwork burden reached "crisis proportions." *Id.*

> Stock certificates and related documents were piled "halfway to the ceiling" in some offices; clerical personnel were working overtime, six and seven days a week, with some firms using a second or even a third shift to process each day's transaction. Hours of trading on the exchange and over the counter were curtailed to give back offices additional time after the closing bell. Deliveries to customers and similar activities dropped seriously behind, and the number of errors in brokers' records, as well as the time to trace and correct these errors, exacerbated the crisis.

Wolfe, *supra*, at 181 n.49 (quoting *SEC Study* at 219 n.1). "The difficulty that brokers and dealers experienced in keeping their records due to the volume of transactions and their thin capitalization caused many brokerage firms to declare bankruptcy and many investors to realize losses." *Id.* at 182.

Congress responded by passing the Securities Investor Protection Act of 1970, which directed the SEC to study the practices leading to the growing crisis in securities transfer. 15 U.S.C. § 78kkk(g). The SEC recommended discontinuing the physical movement of certificates and adopting a depository system. Wolfe, *supra*, at 182 n.58 (citing *SEC Study* at 13). Congress then passed the Securities Acts Amendments of 1975, which directed the SEC to "use its authority under this chapter to end the physical

8

movement of securities certificates in connection with the settlement among brokers and dealers of transactions in securities consummated by means of the mails or any means or instrumentalities of interstate commerce." 15 U.S.C. § 78q-1(e). In a resulting report, the SEC found that "registering securities in other than the name of the beneficial owner" was essential to establishing "a national system for the prompt and accurate clearance and settlement of securities transactions." Kahan & Rock, *supra*, at 1237 n.49.

Thus was born the federal policy of immobilizing share certificates through a depository system. "Congress called for a more efficient process for comparison, clearing, and settlement in a national market system, and for the end of the physical movement of securities certificates in connection with the settlement of transactions among brokers and dealers." Egon Guttman, *Transfer of Securities: State and Federal Interaction*, 12 Cardozo L. Rev. 437, 447 (1990); *accord* S. REP. NO. 94-75 at 5 (1975) ("A national clearance and settlement system is clearly needed."). To comply, "[b]rokerages and banks created [depositories] to allow them to deposit certificates centrally (so-called 'jumbo certificates,' often representing tens or hundreds of thousands of shares) and leave them at rest." Larry T. Garvin, *The Changed (And Changing?) Uniform Commercial Code*, 26 Fla. St. U. L. Rev. 285, 315 (1999).

In 1973, just after the paperwork crisis and with the federal writing on the wall, the members of the New York Stock Exchange created DTC to serve as a depository and clearing agency. Originally there were three regional depositories in addition to DTC: the Midwest Securities Depository Trust Company, which held through its nominee, Kray & Co.; the Pacific Securities Depository Trust Company, which held through its nominee,

9

Pacific & Co; and the Philadelphia Depository Trust Company, which held through its nominee, Philadep & Co. "[I]n the 1990's DTC . . . assumed the activities of the [other] depositories." Carnell & Hanks, *supra*, at 26. Today DTC is the world's largest securities depository and the only domestic depository. Kahan & Rock, *supra*, at 1238 n.50. "DTC is owned by its 'participants,' which are the member organizations of the various national stock exchanges (*e.g.*, State Street Bank, Merrill Lynch, Goldman Sachs & Co.)." *Street Name* at 10-6 to 10-7.

DTC has been estimated to hold "about three-quarters of [the] shares in publicly traded companies." Garvin, *supra*, at 315; *accord* Kahan & Rock, *supra*, at 1236; *Street Name* at 10-4 n.2. "The shares of each company held by DTC are typically represented by only one or more 'immobilized' jumbo stock certificates held in DTC's vaults." *Street Name* at 10-7. "The immobilized jumbo certificates are the direct result of Section 17A(e) of the Exchange Act, in which Congress instructed the SEC to 'use its authority . . . to end the physical movement of securities certificates . . . .'" *Id.* at 10-7 n.10.

The depository system is what enables public trading of securities to take place. In 2014, the NYSE reported average *daily* volume of approximately 1 *billion* shares and approximately 4 *million* separate trades. *See* NYSE Factbook, http://www.nysedata.com/factbook (last visited June 19, 2015). The failure of the certificate-based system to keep up with much lower trading volumes in the 1960s demonstrates that it cannot meet current demand. *Prefatory Note* at 2. Without immobilization and DTC, "implementing a system to settle securities within five business days (T+5), much less today's norm of T+3 or the current goals of T+1 or T+0, would

simply be impossible." Kahan & Rock, *supra*, at 1238. Trading at current levels is only possible because of share immobilization and DTC. *Street Name* at 10-7; *accord* Garvin, *supra*, at 315-16; *Prefatory Note* at 2-3.

Because of the federal policy of share immobilization, it is now Cede—not the ultimate beneficial owner and not the DTC-participant banks and brokers—that appears on the stock ledger of a Delaware corporation. Cede is typically the largest holder on the stock ledger of most publicly traded Delaware corporations. *Street Name* at 10-6. To preserve the pre-immobilization status quo—at least at the federal level—the SEC provided that for purposes of federal law, the custodial banks and brokers remain the record holders. Depositories are defined as "clearing agencies." 15 U.S.C. § 78c(23)(A). The term "record holder" is defined as "any broker, dealer, voting trustee, bank, association or other entity that exercises fiduciary powers which holds securities of record in nominee name or otherwise or as a participant in a clearing agency registered pursuant to section 17A of the Act." 17 C.F.R. § 240.14c–1(i). The term "entity that exercises fiduciary powers" is similarly defined as "any entity that holds securities in nominee name or otherwise on behalf of a beneficial owner but does not include a clearing agency registered pursuant to section 17A of the Act or a broker or a dealer." *Id.* § 240.14c–1(c). Federal law thus looks through DTC when determining a corporation's record holders. For example, when determining whether an issuer has 500 or more record holders of a class of its equity securities such that it must register under 15 U.S.C. § 78l(g), DTC does not count as a single holder of record. Each DTC participant member

11

counts as a holder of record. Michael K. Molitor, *Will More Sunlight Fade The Pink Sheets?*, 39 Ind. L. Rev. 309, 315-16 (2006) (citing SEC interpretive releases).

The federal regulations also ensure that a corporation can easily find out the identities of the banks and brokers who hold shares through DTC. Federal regulations require that DTC "furnish a securities position listing promptly to each issuer whose securities are held in the name of the clearing agency or its nominee." 17 C.F.R. § 240.17Ad–8(b). The participant listing is known colloquially as the "Cede breakdown," and it identifies for a particular date the custodial banks and brokers that hold shares in fungible bulk as of that date along with the number of shares held. A Delaware corporation can obtain a Cede breakdown with ease. In 1981, this court noted that a Cede breakdown could be obtained in a matter of minutes. *Hatleigh Corp. v. Lane Bryant, Inc.*, 428 A.2d 350, 354 (Del. Ch. 1981). A Cede breakdown can now be obtained through DTC's website or by calling the DTC "Proxy Services Hotline." Issuers use the Cede breakdown to understand their stockholder profile, and proxy solicitors use it when advising clients. Commentary regards the information as reliable. *Handbook for the Conduct of Shareholders' Meetings* 40 (ABA Business Law Section, Corporate Governance Committee ed., 2000) (identifying the "lists of holders obtained from depositories" as one of the documents that can be relied on in "determining the shares entitled to vote and tabulating the vote").

A publicly traded corporation cannot avoid going through DTC. Federal law requires that when submitting a matter for a stockholder vote, an issuer must send a broker search card at least twenty business days prior to the record date to any "broker,

12

dealer, voting trustee, bank, association, or other entity that exercises fiduciary powers in nominee name" that the company "knows" is holding shares for beneficial owners. 17 C.F.R. § 240.14a–13(a). Rule 14a–13 provides that "[i]f the registrant's list of security holders indicates that some of its securities are registered in the name of a clearing agency registered pursuant to Section 17A of the Act (e.g., 'Cede & Co.,' nominee for Depository Trust Company), the registrant *shall make* appropriate inquiry of the clearing agency and thereafter of the participants in such clearing agency." *Id.* § 240.14a–13(a) n.1 (emphasis added). An issuer cannot look only at its own records and treat Cede as a single, monolithic owner.

**B.    The Funds Seek Appraisal, And DTC Certificates The Shares.**

Dell was a publicly traded company and the merger involved a stockholder vote, so Dell had to go through the federally mandated process to identify the custodial banks and brokers that held its shares through DTC, then send information through them to the beneficial holders. The list of DTC-participants included JP Morgan and BONY. Through JP Morgan and BONY, information reached the Funds.

The Funds exercised appraisal rights for the 922,975 shares that are the subject of this motion. Because they owned their shares in street name through their custodial banks, the Funds caused Cede to demand appraisal on their behalf. On July 12, 2013, before the vote on the merger, Cede made appraisal demands for the Funds.

DTC held all of the Dell shares registered in street name in fungible bulk, which enabled DTC to track their ownership through electronic bookkeeping entries in the FAST Account. When the Funds caused Cede to make appraisal demands for their

13

shares, DTC moved a corresponding number of shares out of the FAST Account by directing Dell's transfer agent to issue uniquely numbered certificates. By issuing paper certificates, DTC sought to avoid inadvertently surrendering the shares for the merger consideration along with other shares in the FAST Account. This procedure protected Dell, which effectively had "the responsibility of overseeing the surrender of shares after a merger." *Ala. By-Prods.*, 857 A.2d at 263.

Dell's transfer agent is the American Stock Transfer & Trust Company, LLC (the "Transfer Agent"). On July 24, 2013, at DTC's request, the Transfer Agent issued paper stock certificates in Cede's name for the shares owned beneficially by the Funds

## C. DTC Delivers The Certificates To The Custodians, Who Re-Title Them.

As a matter of course, DTC does not act as a custodian of paper stock certificates for its participants, even if those certificates are issued in Cede's name. A participant can pay to have a vault at DTC for its certificates, but that is a separate service. Unless a participant has arranged for a vault, DTC will contact the participant and deliver the paper certificate to the participant for safekeeping.

JP Morgan and BONY do not have vaults at DTC. Therefore, after the Transfer Agent delivered the paper certificates for the Funds' shares, DTC made arrangements to deliver them to JP Morgan and BONY.

When a DTC participant receives a paper certificate from DTC, procedures differ. Some leave the certificates in Cede's name and place them in their vaults. Others require that the certificates be re-registered in the names of their own nominees. JP Morgan's and BONY's internal policies do not permit them to hold paper certificates unless the shares

14

are titled in the names of their own nominees. The custodial banks therefore instructed Cede to authorize the shares to be re-titled in the names of their nominees.

On August 5, 2014, Cede endorsed the Funds' certificates to the custodial banks. Over the next three weeks, the custodial banks arranged for the Transfer Agent to reissue the shares in the names of their nominees. The Transfer Agent reissued the shares held for Milliken and Manulife in the name of Hare & Co. and the shares held for Curtiss-Wright in the name of Mac & Co., which are BONY's nominees. The Transfer Agent reissued the shares held for T. Rowe Price in the name of Kane & Co. and the shares held for Northwestern in the name of Cudd & Co., which are JP Morgan's nominees.

There was an additional hiccough at BONY. Shortly after the Transfer Agent reissued the shares, BONY conducted a routine weekly sweep of its vault. BONY found the stock certificates for the shares beneficially owned by Manulife and Milliken and re-deposited them with DTC in the FAST Account.

On September 12, 2013, a majority of Dell's shares voted in favor of the merger. A few weeks later, on October 4, BONY realized that the shares beneficially owned by Manulife and Milliken had been re-deposited in the FAST Account. BONY withdrew them from DTC and had new certificates issued in the name of Hare & Co.

Other than taking steps to cause DTC to demand appraisal for their shares through Cede, the Funds had no involvement in any of the transfers. The Funds did not explicitly approve any or the transfers or cause any of them to take place. The Funds concede that under their agreements with their custodial banks, they gave their custodians authority to make these types of back-office transfers.

15

**D.** **The Merger Closes, And The Funds Seek Appraisal.**

The merger closed on October 29, 2013. The Funds filed timely petitions seeking appraisal. They disclosed the issues relating to the re-titling of their shares. Dell moved for summary judgment.

## II. LEGAL ANALYSIS

Under Court of Chancery Rule 56, summary judgment "shall be rendered forthwith if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Ct. Ch. R. 56(c). The facts underlying the motion are undisputed, and its outcome turns purely on the following question of law: Does the Continuous Holder Requirement bar a beneficial owner from pursuing appraisal if there has been an administrative transfer at the depository level? Under current law, the answer is yes.

Read together, the Continuous Holder Requirement and the Record Holder Requirement mandate that an appraisal petitioner "continuously hold" the shares for which appraisal is sought as a "holder of record" through the effective date of the merger. 8 *Del. C.* § 262(a). There is no dispute that the Funds continuously held their shares as beneficial owners through the effective date of the merger. There is also no dispute that the Funds' custodial banks continuously held the shares on behalf of the Funds through the effective date of the merger. The outcome of the motion turns on the implications of a single event for "holder of record" status: a change in the name on the shares from DTC's nominee to the custodial banks' nominees.

16

The appraisal statute does not define what it means to be a "holder of record." No other provision of the DGCL defines what it means to be a "holder of record." The current interpretation is circular: "The appraisal statute confers the right to an appraisal only upon the stockholder of record in the corporation. Consequently, only the person appearing on the corporate records as the owner of stock in the corporation may qualify for an appraisal . . . ." *Engel v. Magnavox Co.*, 1976 WL 1705, at *1 (Del. Ch. Apr. 22, 1976). But that statement begs the question: What are the records of the corporation for purposes of determining legal ownership?

In a simplified model of a Delaware corporation, the corporate secretary maintains a document called the stock ledger. From the corporation's standpoint, the stock ledger identifies all of the legally relevant transactions in the corporation's shares, including the date when any person acquires shares and the number of shares acquired, and the date when any person transfers shares and the number of shares sold. If a holder transfers shares without notifying the corporation, the corporation is not required to discover that fact, nor need the corporation voluntarily treat the new holder as the legal owner. The corporation can rely on its records until a stockholder takes proper steps to transfer title to the shares. Under this system, a paper stock certificate is not actually a share of stock. It is only evidence of ownership of a share of stock.[5]

---

[5] *See* 8 *Del. C.* § 158 ("The shares of a corporation shall be *represented* by certificates, provided that the board of directors of the corporation may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares.") (emphasis added); *Testa v. Jarvis*, 1994 WL 30517, at *6 (Del. Ch. Jan. 12, 1994) (Allen, C.) (noting that "possession of a certificate does not itself

17

If the corporation needs to determine who its current stockholders are as of a particular date, the corporate secretary uses the stock ledger to prepare a stock list. The stock list identifies those stockholders who own stock as of a given date, together with the number and type of shares owned, based on the records. *See* 8 *Del. C.* § 219(a) & (c). Evidencing the connection between this process and the concept of a record holder, the date used for preparing the stock list is called the "record date."[6]

For most contemporary public corporations, the simplified model no longer holds. Virtually all public corporations have outsourced the maintaining of the stock ledger to a transfer agent, as Dell did. The stock ledger and the stock list as of a particular record date are corporate records, but they exist and are maintained outside the corporation.

---

constitute ownership of shares"); *Haskell v. Middle States Petroleum Corp.*, 165 A. 562, 563 (Del. Ch. 1933) ("[A] person may be the legal owner of stock even though he has received no certificate; therefore, the certificate is only evidence of ownership."); *Smith v. Universal Serv. Motors Co.*, 147 A. 247, 248 (Del. Ch. 1929) ("The status of stockholder in a corporation is not dependent on the issuance to him of a certificate of stock. The certificate is only an evidence of ownership—a muniment of title."); *Mau v. Mont. Pac. Oil Co.*, 141 A. 828, 831 (Del. Ch. 1928) ("Possession of a certificate is not essential to the ownership of stock."); *Baker v. Bankers' Mortg. Co.*, 135 A. 486, 488 (Del. Ch. 1926) ("Certificates of stock are themselves only evidence of shares. They are not the shares.") (Wolcott, Jos., C.), *aff'd sub nom. Sohland v. Baker*, 141 A. 277 (Del. 1927).

[6] *See id.* § 213 (establishing procedures for fixing a record date for determining the stockholders of record entitled (i) to notice of any meeting of stockholders (§ 213(a)), (ii) to vote at any meeting of stockholders (§ 213(a)), (iii) to act by written consent without a meeting (§ 213(b)), or (iv) to receive a dividend or other distribution or allotment of rights (§ 213(c))).

## A. Existing Delaware Law Applied To This Case

If the only relevant records are those maintained by Dell or the Transfer Agent, then summary judgment must be granted in favor of Dell. Under existing precedent, Cede was the stockholder of record for purposes of the Funds' shares and therefore made the appraisal demand. "The record holder must . . . continuously hold such shares [seeking appraisal] through the effective date of the merger . . . ." *In re Appraisal of Transkaryotic Therapies, Inc.*, 2007 WL 1378345, at *3 (Del. Ch. May 2, 2007). It is the "record holder—not the beneficial owner—[that] is subject to the statutory requirements for showing entitlement to appraisal and demonstrating perfection of appraisal rights under Sections 262(a) and (d)." *In re Ancestry.com, Inc.*, 2015 WL 66825, at *8 (Del. Ch. Jan. 5, 2015). The re-titling of a certificated share after the demand but before the effective date violates the Continuous Holder Requirement by causing record ownership to change. *See Nelson v. Frank E. Best Inc.*, 768 A.2d 473, 477 (Del. Ch. 2000) (Strine, V.C.) (noting that after Cede transferred record ownership of shares seeking appraisal to appraisal petitioner "Cede's demand was invalid, because Cede would not 'continuously' be the holder of record between the . . . date of Cede's demand and the effective date of the Merger, as is required by 8 *Del. C.* § 262(a).").

There is no dispute that on Dell's records as maintained by the Transfer Agent, legal ownership of Funds' shares changed from Cede to the four current nominees: Mac & Co., Kane & Co., Hare & Co., and Cudd & Co. When the shares were re-titled, the Funds lost their appraisal rights.

In an effort avoid this result, the Funds cite *Alabama By-Products* and contend that "because the right to appraisal vests at the time of perfection, the redemption of the beneficial owners' shares by the custodian and record holder without the knowledge of the beneficial owners [does] not extinguish the beneficial owners' right to appraisal of the fair value of their shares." Petitioners' Br. at 13. The issue in *Alabama By-Products* was whether the surrender by DTC of the appraisal petitioners' shares and the subsequent distribution of the merger consideration deprived the appraisal petitioners of properly perfected appraisal rights. At the time of the surrender, more than sixty days had elapsed since the closing of the merger, and an appraisal petition had been filed within the statutory time period. Under the appraisal statute, a stockholder cannot unilaterally withdraw an appraisal demand more than sixty days after the merger closes, and any withdrawal after the filing of a petition requires court approval. 8 *Del. C.* § 262(h). The Delaware Supreme Court held that DTC's surrender of the shares more than sixty days after the merger closed, post petition, and without court approval did not compromise the petitioners' appraisal rights because the surrender did not satisfy the statutory requirements.

To bring themselves within the scope of *Alabama By-Products*, the Funds describe their appraisal rights as "perfected," but the only step in the statutory process that had been completed at the time of the re-titling was the making of a demand. The merger had not yet closed, the time for unilateral withdrawals had not yet elapsed, and no appraisal petition had been filed. When the Funds' shares were re-titled, their appraisal rights remained fragile and easily lost through voluntary action by the holder. The custodial

20

banks instructed DTC and the Transfer Agent to re-title the shares, and under current law, ownership changes driven by DTC's role in the depository system are regarded as voluntary transfers. At the stage when the re-titling occurred, the statutory provisions found controlling in *Alabama By-Products* did not yet apply.

The Funds also contend that the Continuous Holder Requirement should be "liberally construed for the protection of objecting stockholders, within the boundaries of orderly corporate procedures and the purpose of the requirement," which is a passage quoted from *Raab v. Villager Industries, Inc.*, 355 A.2d 888, 891 (Del. 1976). But as the language of this passage shows, *Raab* addressed the procedure for making objections under the version of the appraisal statute that existed before 1976. In that statutory scheme, a stockholder who wanted to exercise appraisal rights had to send a written objection to the corporation before the merger vote, then submit a written demand for appraisal after the merger vote. *See* 2 Balotti & Finkelstein, *supra*, § 262 at IX-159. The purpose of the first step—the written objection—was "merely to give notice." *Zeeb v. Atlas Powder Co.*, 87 A.2d 123, 127 (Del. 1952). The Delaware Supreme Court construed the objection requirement more liberally than the demand requirement because "[t]he purpose of the objection [was] of lesser importance than the demand for payment." *Raab*, 355 A.2d at 891.

Stockholders seeking appraisal no longer have to make a separate objection, so *Raab*'s language regarding the "liberal construction" of this requirement is no longer relevant. Delaware decisions have *not* generally construed other aspects of the appraisal statute liberally in favor of stockholders. *See generally* Jesse A. Finkelstein & John D.

21

Hendershot, *Appraisal Rights in Mergers & Consolidations* at A-97 (5th ed. 2010) (collecting cases). The Delaware Supreme Court has endorsed a principle of strict construction, explaining that "[b]y exacting strict compliance . . . , the appraisal statute ensures the expedient and certain appraisal of stock." *Ala. By-Prods.*, 657 A.2d at 263. In subsequently re-affirming its adherence to the principle, the Delaware Supreme Court cautioned that strict construction should be applied "even-handedly, not as a one-way street." *Berger v. Pubco Corp.*, 976 A.2d 132, 144 (Del. 2009). In other words, both petitioners and the corporation must adhere strictly to the appraisal statute's requirements; neither gets the benefit of the doubt under more a lenient rule of "liberal construction." Given these pronouncements and existing precedent, the Funds cannot rely on a principle of liberal construction to preserve their appraisal rights.

Finally, the Funds have pointed to the fact that they did not know about or approve the nominee-level transfers. It is undisputed that their agreements with their custodial banks permitted the banks to re-title the shares. Our law currently treats ownership changes driven by the depository system as voluntary transfers, making this a risk that the Funds accepted. By choosing to hold through intermediaries, the Funds assumed the risk that the intermediaries might "act contrary to [their] interests." *Ala. By-Prods.*, 657 A.2d at 262.

## B.    The Possibility Of A Different Approach

There is another possible interpretation of the Record Holder Requirement. When Congress and the SEC created the depository system, they added DTC at the bottom of the ownership chain and introduced Cede as the new omnibus record holder, but the

identities of the custodial banks and brokers did not go away. They continue to appear on the DTC participant list. As discussed in the Factual Background, the DTC participant list is an integral part of the federally mandated ownership scheme. A publicly traded corporation cannot avoid going through DTC. *See* 17 C.F.R. § 240.14a–13(a). Rule 14a–13 requires that the issuer "make appropriate inquiry" of DTC to identify the custodial banks and brokers who own shares through Cede. *Id.* § 240.14a–13(a) n.1. An issuer cannot rely on the stock ledger maintained by its transfer agent, pretend that Cede is a single record holder, and ignore the Cede breakdown. For purposes of federal law, Cede is *not* a record holder. 15 U.S.C. § 78c(23)(A). The record holders are the banks and brokers on the DTC participant list. 17 C.F.R. § 240.14c–1(i).

Were I writing on a blank slate, I would hold that the "records" of the corporation for purposes of determining who is a "stockholder of record" include the DTC participant list. Under this interpretation, the custodial banks and brokers who appear on the DTC participant list would be stockholders of record for purposes of Delaware law, just as they are for federal law and just as they were before share immobilization. If that rule applied, then the motion for summary judgment would be denied, because there was no change of ownership at the DTC participant level.

In my view, this interpretation better reflects current reality. Viewed pragmatically, the federal policy of share immobilization compelled publicly traded Delaware corporations to outsource one part of the stock ledger—the DTC participant list—to DTC, just as Delaware corporations have chosen to outsource other parts of the stock ledger to transfer agents. Before share immobilization, banks and brokers appeared

23

on the stock ledger as registered holders. After share immobilization, the same banks and brokers appear on the stock ledger indirectly through DTC and the Cede breakdown. Just as Delaware law treats the outsourced stock ledger as a record of the corporation, albeit one maintained by a third party, Delaware law likewise should treat the outsourced DTC participant list as a record of the corporation, albeit one maintained by DTC.

Adopting this approach would recognize that the changes in ownership driven by the role of DTC in the depository system result from the federal policy of share immobilization. This case provides a fitting example. But for the federal mandate, JP Morgan and BONY would have appeared through their nominees on the stock ledger maintained by the Transfer Agent. There would have been no need to re-title the shares. The Funds lost their appraisal rights because of a system imposed by federal law.

But in light of existing precedent, I do not believe that this court is free to interpret the "holder of record" language in this manner. I previously advocated treating DTC participants as holders of record for purposes of analyzing whether the shares they held could be voted without a DTC omnibus proxy. *See Kurz v. Holbrook*, 989 A.2d 140 (Del. Ch.), *aff'd in part, rev'd on other grounds sub nom. Crown EMAK P'rs, LLC v. Kurz*, 992 A.2d 377 (Del. 2010). The *Kurz* decision posited that recognizing DTC participants as record owners would have beneficial effects for other areas of Delaware law, including appraisal. *See Kurz,* 989 A.2d at 174 ("In some circumstances, Delaware corporations should benefit from looking through DTC to the holdings of the participant banks and brokers. Reducing the number of shares available for appraisal arbitrage is one area that springs to mind.").

On appeal, the Delaware Supreme Court reversed the *Kurz* decision on other grounds, rendering it unnecessary for the high court to consider whether DTC participants should be treated as record holders. The Delaware Supreme Court nevertheless characterized the discussion of the DTC participant list as "*obiter dictum*" that was "without precedential effect."[7] The high court stated that

> a legislative cure is preferable. The DGCL is a comprehensive and carefully crafted statutory scheme that is periodically reviewed by the General Assembly. Indeed, the General Assembly made coordinated amendments to section 219 and section 220 in 2003. Any adjustment to the intricate scheme of which section 219 is but a part should be accomplished by the General Assembly through a coordinated amendment process.

---

[7] *EMAK P'rs*, 992 A.2d at 398. There is perhaps some irony in using dictum to characterize a portion of a decision as dictum, although perhaps greater irony in using dictum to instruct trial judges not to use dictum. *See Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206 (Del. 2012). *See generally* Mohsen Manesh, *Damning Dictum: The Default Duty Debate In Delaware*, 39 J. Corp. L. 35, 54-63 (2013) (exploring tensions in *Gatz*). My discussion of an alternative approach to the Record Holder Requirement is admittedly dictum. I considered the alternative of setting forth these views in a law review article or speech, as *Gatz* suggested, but it seemed to me that to the extent a trial judge wished to suggest to an alternative approach that the Delaware Supreme Court might consider, a judicial opinion that could be reviewed by the Delaware Supreme Court would provide an appropriate and efficient vehicle. *See, e.g., In re Cox Commc'ns, Inc. S'holder Litig.*, 879 A.2d 604, 642-48 (Del. Ch. 2005) (Strine, V.C.) (recommending change in standard of review for controller squeeze-outs); *Agostino v. Hicks*, 845 A.2d 1110, 1121 (Del. Ch. 2004) (recommending change in standard for distinguishing between direct and derivative actions); *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967-70 (Del. Ch. 1996) (Allen, C.) (recommending change in the law's approach to the duty of oversight). One obvious benefit is that in the event of an appeal, should there by one, the Delaware Supreme Court will have all of the arguments before it in one place. Unless and until the alternative approach discussed in this opinion is adopted by the Delaware Supreme Court, no one should be misled into believing that it has precedential effect. *Cf. Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 167 (Del. 2002) (expressing concern that dictum in trial court opinion "should not be ignored because it could be misinterpreted in future cases as a correct rule of law" and "could be relied upon adversely by courts, commentators and practitioners in the future").

*EMAK P'rs*, 992 A.2d at 398.

I respectfully disagree with expressed preference for a legislative cure. In my view, the question of what constitutes the records of the corporation for purposes of determining who is a "holder of record" is a quintessential issue of statutory interpretation appropriate for the judiciary to address. As the Delaware Supreme Court has explained, "[i]n our constitutional system, this court's role is to interpret the statutory language that the General Assembly actually adopts, even if unclear and explain what we ascertain to be the legislative intent without rewriting the statute to fit a particular policy position." *Taylor v. Diamond State Port Corp.*, 14 A.3d 536, 542 (Del. 2011). "[T]he Constitution invests the Judiciary, not the Legislature, with the final power to construe the law." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 325 (1992). The interpretation of statutory text is "one of the Judiciary's characteristic roles." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986).

The Delaware courts play a particularly significant role in the corporate arena.[8] Historically the judiciary, rather than the General Assembly, has taken the lead when

---

[8] Lawrence Hamermesh, *How We Make Law in Delaware, and What to Expect from Us in the Future*, 2 J. Bus. & Tech. L. 409, 409 (2007) ("The best-known of the principal policymakers in Delaware are the members of the judiciary."); Marcel Kahan & Edward Rock, *Symbiotic Federalism and the Structure of Corporate Law*, 58 Vand. L. Rev. 1573, 1591 (2005) ("The most noteworthy trait of Delaware's corporate law is the extent to which important and controversial legal rules are promulgated by the judiciary, rather than enacted by the legislature."); Jill E. Fisch, *The Peculiar Role of the Delaware Courts in the Competition for Corporate Charters*, 68 U. Cin. L. Rev. 1061, 1075 (2000) ("Delaware corporate law relies on judicial lawmaking to a greater extent than other states.").

addressing corporate law issues.[9] Two leading commentators have noted that the Delaware Supreme Court has not traditionally deferred to the prospect of legislative action. Rather, "the Delaware Supreme Court has shown a certain degree of discomfort with, perhaps even hostility to, legislative intrusions into its domain."[10]

The significant role played by the Delaware courts stems from the fact that, *contra EMAK*, the DGCL has not been viewed traditionally as a comprehensive code, but rather as a broadly enabling statute that leaves ample room for private ordering and interpretation.[11] In an article written while serving as a Vice Chancellor, Chief Justice

---

[9] *See, e.g.,* Hamermesh, *supra*, at 414 ("[W]e view the courts as the first line of defense, the first responders in dealing with complex situations. When drafting legislation, we abstain from addressing complicated matters that are hard to figure out, allowing them to develop through the common law."); Omari Scott Simmons, *Branding the Small Wonder: Delaware's Dominance and the Market for Corporate Law*, 42 U. Rich. L. Rev. 1129, 1159 (2008) ("As a result of the legislature's preference against regulatory prescription and its deference to the judicial branch, Delaware courts are often the first responders to corporate law controversies."); *see also* Lawrence A. Hamermesh & Norman M. Monhait, *A Delaware Response to* Delaware's Choice, 39 Del. J. Corp. L. 71, 75 (2014) (agreeing that the Corporation Law Council and the General Assembly "have often subscribed to a . . . 'wait-and-see approach' proposing and enacting, respectively, amendments to the DGCL only when there are persuasive reasons to do so" and endorsing a continuing policy of "reticence to initiate legislative action").

[10] Kahan & Rock, *Symbiotic Federalism*, *supra*, at 1594. The commentators referred to "numerous examples of this tendency" and provided five examples. *Id.* at 1594-96. All involved statutory interpretation. *Id.* One involved the interpretation of the appraisal statute. *Id.* (citing the narrow interpretation given to language in 8 *Del. C.* § 262(h) in *Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del. 1983)).

[11] *See, e.g., Shintom Co. v. Audiovox Corp.*, 888 A.2d 225, 227 (Del. 2005) (describing the DGCL as "an enabling statute that provides great flexibility for creating the capital structure of a Delaware corporation."); *In re Topps Co. S'holders Litig.*, 924 A.2d 951, 958 (Del. Ch. 2007) (Strine, V.C.) (describing the DGCL as "a broadly enabling statute"); *Jones Apparel Gp., Inc. v. Maxwell Shoe Co.*, 883 A.2d 837, 845 (Del.

Strine distinguished between the "Delaware Model," in which the statute is "largely enabling and provides a wide realm for private ordering," and the "Mandatory Statutory Model," under which the corporate code would be "quite detailed and prescriptive." Leo E. Strine, Jr., *Delaware's Corporate-Law System: Is Corporate America Buying an Exquisite Jewel or A Diamond in the Rough? A Response to Kahan & Kamar's* Price Discrimination in the Market for Corporate Law, 86 Cornell L. Rev. 1257, 1260 (2001). Because the latter type of statute "would dictate how things should happen, there would be less room for judicial interpretation, but also less space for director choice." *Id.* Chief Justice Veasey has drawn a similar distinction in his own scholarly writings:

> A flexible or indeterminate regime, such as we have had in Delaware, is distinct from a rigid codification system that prevails in many systems outside the United States. That is part of the genius of our law. Life in the boardroom is not black and white; directors and officers make decisions in shades of gray all the time. A "clear" law, in the sense of one that is codified, is simply not realistic . . . . There can be no viable corporate governance regime that is founded on a "one size fits all" notion.

Ch. 2004) (Strine, V.C.) (noting that the DGCL is "is widely regarded as the most flexible in the nation because it leaves the parties to the corporate contract (managers and stockholders) with great leeway to structure their relations, subject to relatively loose statutory constraints"); *Matter of Appraisal of Ford Hldgs., Inc. Preferred Stock*, 698 A.2d 973, 976 (Del. Ch. 1997) (Allen, C.) (explaining that "unlike the corporation law of the nineteenth century, modern corporation law contains few mandatory terms; it is largely enabling in character"); *accord* E. Norman Veasey & Christine T. Di Guglielmo, *History Informs American Corporate Law: The Necessity of Maintaining A Delicate Balance in the Federal "Ecosystem"*, 1 Va. L. & Bus. Rev. 201, 204 (2006) ("Corporate statutes, like the Delaware General Corporation Law, continue to take an enabling approach and allow wide latitude for private ordering."); Edward P. Welch & Robert S. Saunders, *Freedom and Its Limits in the Delaware General Corporation Law*, 33 Del. J. Corp. L. 845, 847 (2008) ("The DGCL gives incorporators enormous freedom to adopt the terms they believe are most appropriate for the organization, finance, and governance of their particular enterprise.").

E. Norman Veasey & Christine T. Di Guglielmo, *What Happened in Delaware Corporate Law and Governance from 1992-2004? A Retrospective on Some Key Developments*, 153 U. Pa. L. Rev. 1399, 1412-13 (2005) (footnotes omitted). The "skeletal framework" set forth in the flexible DGCL necessarily requires judicial interpretation. *Id.* at 1411.

A review of applicable precedent teaches that for purposes of the issue discussed in this case, there is ample room for a continuing judicial role. A statutory amendment is one method of modernizing the law, but it is not the only way.

### 1. The Creation Of The Record Holder Requirement

The statutory appraisal remedy dates back to the adoption of the DGCL in 1899. The original statute contained a section that stated:

> If any stockholder in either corporation consolidating aforesaid, who objected thereto in writing, shall within twenty days after the agreement of consolidation has been filed and recorded, as aforesaid, demand in writing from the consolidated corporation payment of his stock, such consolidated corporation shall, within three months thereafter, pay to him the value of the stock at the date of consolidation.

21 Del. Laws c. 273 § 56 (1899). The provision referred only to the right of "any stockholder" to seek payment of the value of his stock, without specifying whether the stockholder had to be a holder of record.

Nearly five decades later, despite a series of intervening amendments, the Delaware appraisal statute continued to refer to "any stockholder" having the right to seek appraisal. The question of whether a beneficial owner could seek appraisal was finally raised in a proceeding arising out of the merger between Salt Dome Oil

Corporation and Gulfboard Oil Corporation. *See Schenck v. Salt Dome Oil Corp.*, 34 A.2d 249 (Del. Ch. 1943), *rev'd*, 41 A.2d 583 (Del. 1945).

William Schenck and his fellow petitioners owned a total of 7,100 shares of Salt Dome common stock, which were registered on its books in the name of Guido Pantaleoni, Jr. They also owned a total of 10,000 shares of Gulfboard common stock, which were registered on its books in the name of Berberich & Co. The petitioners made timely objections to the merger and submitted timely demands for appraisal. They did so in their own names, although their objections and demands identified the record holders and the number of shares for which appraisal was sought. The respondent corporations argued that the petitioners could not seek appraisal unless their names appeared on the stock ledger, regardless of whatever other information they might provide or documentation they might introduce to substantiate their ownership.

Chancellor Harrington rejected this argument, reasoning that on the facts presented, a court of equity could recognize the petitioners as the real owners of the shares. *Schenck*, 34 A.2d at 252. He declined to construe the term stockholder "in a strictly legal sense" as limited to holders of record. *Id.* Instead, he reasoned that "Section 61 of the General Corporation Law [the appraisal statute] is clearly for the protection of objecting shareholders [and] should be liberally construed to that end." *Id.* Although the Chancellor acknowledged that a corporation can only look to its stock list to determine who its stockholders are, he concluded that "the real owner of the shares, nevertheless, has substantial rights that may be materially affected by a corporate consolidation." *Id.*

The companies appealed, and the Delaware Supreme Court took the opposite view. In reaching its conclusion, the high court discussed (i) the nature of the appraisal remedy, which it regarded as an action at law rather than a proceeding in equity, (ii) existing authorities which said that a corporation could rely exclusively on the information in its records to determine stockholder status, and (iii) a balancing of competing public policies, in which the importance of certainty and predictability prevailed, particularly given the absence of any benefit to the corporation from the then-prevailing system of beneficial ownership.

First, the Delaware Supreme Court viewed the appraisal proceeding as a legal rather than equitable proceeding. Because appraisal was a statutory remedy, the high court reasoned that "[t]he right of an unregistered transferee of stock to object to a proposed agreement of merger must be looked for in the statute." *Salt Dome*, 41 A.2d at 587. The court found "nothing in the language of the statute that makes clear the legislative intent to bestow the remedy provided upon an equitable owner of stock, but much, indeed, to the contrary." *Id.* at 588. Rather than an equitable action for breach of fiduciary duty, the appraisal proceeding resembled a debt collection action. A stockholder could collect an appraisal award "as other debts are by law collectible, that is, by suit at law, judgment at law, and by the usual legal process." *Id.*

Second, the Delaware Supreme Court summarized existing authorities addressing the rights that a beneficial owner had at law:

> The term, 'stockholder', ordinarily, is taken to apply to the holder of the legal title to shares of stock. In most jurisdictions registration, or its equivalent, is essential to pass the legal title as against the corporation; and

31

the unregistered transferee is not entitled to the rights and privileges of a stockholder in his relations with the corporation. Whatever may be the equitable rights that may arise by a delivery of the stock certificate accompanied with a power of attorney for its transfer, the legal title and legal rights and liabilities of the stockholder of record remain unchanged until the transfer is actually accomplished. The record owner may be but the nominal owner, and, technically, a trustee for the holder of the certificate, but legally he is still a stockholder, and may be treated as the owner by the corporation.

*Id.* at 585 (citations omitted). After reviewing Delaware authorities addressing other stockholder rights, most notably the right to vote, the court concluded that only a registered stockholder was entitled to exercise legal rights and be treated as a stockholder by the corporation. *See id.* at 585-89.

Third, the *Salt Dome* court turned to considerations of public policy:

With respect to matters intracorporate affecting the internal economy of the corporation, or involving a change in the relationship which the members bear to the corporation, there must be order and certainty, and a sure source of information, so that the corporation may know who its members are and with whom it must treat, and that the members may know, in a proper case, who their associates are. Especially is this true in a merger proceeding which is essentially an intracorporate affair. The merging corporations are entitled to know who the objecting stockholders are so that the amount of money to be paid to them may be provided. The stockholders in general are entitled to know the dissentients and the extent of the dissent. The corporation ought not to be involved in possible misunderstandings or clashes of opinion between the non-registered and registered holder of shares. It may rightfully look to the corporate books as the sole evidence of membership.

*Id.* at 589 (citation omitted). The Supreme Court reasoned that the relationship between the customer and the broker was a voluntary one, making it appropriate to place any attendant risk on the stockholder: "If, for any reason, [a stockholder] chooses to allow his shares to be registered on the corporate books in the name of another, it is not a denial of

32

his right of actual ownership to require him to establish his rights and pursue his remedy through the nominee of his own selection." *Salt Dome*, 41 A.2d at 589. The high court therefore held that "only the registered holder of stock is a 'stockholder' within the sense of the word as used in" the appraisal statute. *Id.*

Importantly for present purposes, *Salt Dome* only addressed the broker level of the beneficial ownership chain. The decision obviously pre-dated the federal policy of share immobilization—still three decades in the future—so the Delaware Supreme Court could not have considered whether any distinctions were warranted at the depository level of ownership, the competing policy considerations raised by the federal response to Wall Street's paperwork crisis, or the benefits that the system provided to issuers. At the time, the decision to hold in street name properly could be regarded as a matter of choice, rather than involving at least one level of beneficial ownership (the depository level) that resulted from federal law. The Delaware Supreme Court also could regard exclusive reliance on the stock ledger as promoting "order and certainty" and providing a "sure source of information." After the federal policy of share immobilization, a legal rule that looks no further than Cede has the opposite effect. It masks the implications of beneficial ownership and promotes uncertainty.

Perhaps most important, the *Salt Dome* decision did not pre-judge what documents might encompass the appropriate records for determining registered status and whether, after the adoption of the depository system, those records should include the DTC participant list. What the *Salt Dome* decision does show, however, is that interpreting the

appraisal statute to determine which stockholders are entitled to appraisal is an appropriate subject for the courts.

### 2. Post-*Salt Dome*, Pre-Codification Cases

After *Salt Dome*, the Delaware Supreme Court adhered to the Record Holder Requirement in *Olivetti Underwood Corp. v. Jacques Coe & Co.*, 217 A.2d 683 (Del. 1966) and *Carl M. Loeb, Rhoades & Co. v. Hilton Hotels Corp.*, 222 A.2d 789 (Del. 1966). The Court of Chancery applied it in *Application of General Realty & Utilities Corp.*, 42 A.2d 24 (Del. Ch. 1945). The *Olivetti* decision is noteworthy because it re-framed the corporation's prerogative to rely on its records as a restriction on the corporation's ability to look any further than its records.

The petitioners in *Olivetti* were brokers who were registered stockholders of Olivetti Underwood Corporation. The brokers made appraisal demands in which they notified Olivetti that they were record holders and did not beneficially own the stock registered in their names. Underwood moved to dismiss the petitions, arguing that the brokers failed to submit proof of their authority to act for the beneficial owners. Citing *Salt Dome*, the Court of Chancery reasoned that the corporation "ha[d] no right to raise any issue as to the right of a registered owner to seek a statutory appraisal and such a stockholder has no duty to supply proof as to that issue." *Abraham & Co. v. Olivetti Underwood Corp.*, 204 A.2d 740, 741 (Del. Ch. 1964). Underwood appealed.

The Delaware Supreme Court affirmed. After quoting *Salt Dome* at length, the high court summarized "the rule of the *Salt Dome* case" as follows: "[T]here is no recognizable stockowner under the merger-appraisal provisions of our Corporation Law

34

except a registered stockholder." *Olivetti*, 217 A.2d at 686. By restating the holding of the earlier decision in this fashion, the Delaware Supreme Court expanded the rule. Where the *Salt Dome* decision permitted a corporation to confine itself to dealing with registered stockholders in intra-corporate affairs, the *Olivetti* opinion required it. The court went further and stated that the corporation "should avoid becoming involved in the affairs of registered stockholders vis-á-vis beneficial owners," admonishing that "the relationship between, and the rights and obligations of, a registered stockholder and his beneficial owner are not relevant issues in a proceeding of this kind." *Id.* at 686, 687.

### 3. The Codification Of The Record Holder Requirement

During the 1967 revisions to the DGCL, the General Assembly codified the Record Holder Requirement. The new version of the appraisal statute included the following language:

> When used in this section, the word "stockholder" means a holder of record of stock in a stock corporation and as a member of record of a non-stock corporation; the words "stock" and "share" mean and include what is ordinarily meant by those words and also membership or membership interest of a member of a non-stock corporation.

56 Del. Laws c. 50 § 262(a) (1967). In his landmark treatise, Professor Folk explained the purpose of the new text.

> Section 262(a), as revised in 1967, defines "stockholder," for purposes of the appraisal remedy, as a holder of record. Although the prior statute was not couched in terms so confined, the prior cases consistently limited the remedy to record owners on the theory that a corporation should, in estimating the number of dissenters, be able to rely exclusively upon corporate records of stock ownership and should not become involved in disputes between registered and nonregistered stockholders. Moreover, the unregistered stockholder is not harmed, since it is within the power to obtain the advantages of record ownership by a transfer into his own name.

35

Ernest L. Folk, III, *The Delaware General Corporation Law: A Commentary and Analysis* 373 (1972) (footnotes omitted). Professor Folk also warned that the concept of record ownership did not operate only as an impediment to appraisal petitioners: "The registered stockholder requirement cuts both ways. Not only is the corporation entitled to look solely to record ownership, but in fact it may ordinarily not inquire into the authority of a registered holder to act for beneficial owners." *Id.* at 374 (footnotes omitted).

All of the qualifications and limitations of the common law version of the Record Holder Requirement apply to the statutory version. The amendment pre-dated the federal policy of share immobilization, although that initiative soon would loom on the horizon. Because the depository system had not yet been established, the General Assembly had no ability to consider the depository level of ownership or the competing policy considerations that led to its creation. Notably, the language of the statutory provision only required that the stockholder be "a holder of record of stock in a stock corporation and as a member of record of a non-stock corporation . . . ." It did not specify what documents might encompass the appropriate records for determining registered status and whether, after the adoption of the depository system, those records should include the DTC participant list.

### 4. Delaware's Limited Acknowledgement Of Share Immobilization

During the mid-1970s, the SEC implemented the federal policy of share immobilization. Delaware decisions largely ignored this development. Rather than distinguishing between the broker level and the depository level, they treated both as a

matter of convenience that resulted exclusively from the private contractual relationship between a broker and its clients. That perception was inaccurate.

A representative decision is *Carico v. McCrory Corp.*, 4 Del. J. Corp. L. 595 (Del. Ch. July 13, 1978). The defendant corporation received a timely written objection from the beneficial holder of the corporation's stock. The objection failed to disclose the identity of the record holder, Cede. The corporation objected to the claim on the ground that a proper written objection was not received from or on behalf of the record holder of the stock in issue. This court agreed, noting that "[t]t is well established that an objection which does not enable the resulting corporation to identify the actual record holder is insufficient." *Id.* at 598. The court reasoned similarly in *Engel v. Magnavox Co.*, 1976 WL 1705, as did the Delaware Supreme Court in *Raab*. In fairness, these decisions involved merger objections made by beneficial owners at the top of the ownership chain, so it did not matter whether the record owner was Cede or a broker or custodial bank. In either case, the wrong party made the objection.

In contrast to these decisions, when considering actions brought under a different section of the DGCL, the Court of Chancery showed greater sensitivity to the depository revolution. When stockholders sought to obtain a stock list under Section 220, Delaware decisions held that the Cede breakdown was part of the list.[12] Ever since, Delaware

---

[12] *See Hatleigh Corp. v. Lane Bryant, Inc.*, 428 A.2d 350 (Del. Ch. 1981); *Giovanini v. Horizon Corp.*, 1979 WL 178568 (Del. Ch. Sept. 10, 1979).

decisions have ordered the production of a Cede breakdown as part of the stock list.[13] The decisions did not limit stockholder status to the names appearing on the stock ledger, in which case the inquiry would have stopped with Cede and the breakdown would have been irrelevant. *See Olson v. Buffington*, 1985 WL 11575, at *3 (Del. Ch. July 17, 1985) ("This Court has recognized that a party entitled to a stocklist pursuant to § 220 is also entitled to a Cede breakdown even though technically Cede is the record holder on the company's books.").

### 5.  An Opportunity Lost: The *Enstar* Decisions

An opportunity to confront the implications of the depository system for appraisal finally arose in litigation arising out of a merger involving Enstar Corporation. *See In re Appraisal of Enstar Corp.* (*Enstar I*), 1986 WL 8062 (Del. Ch. July 17, 1986), *rev'd sub nom. Enstar Corp. v. Senouf* (*Enstar II*), 535 A.2d 1351 (Del. 1987). The litigation began as an appraisal proceeding, but Enstar reached a global settlement of the appraisal litigation. After Enstar refused to pay two of the appraisal petitioners, the matter transformed itself into a breach of contract case, with the petitioners seeking to enforce their entitlement to the settlement consideration.

---

[13] *E.g., Berger v. Pubco Corp.*, 2008 WL 4173860, at *3 (Del. Ch. Sept. 8, 2008); *Wynnefield P'rs Small Cap Value, L.P. v. Niagara Corp.*, 2006 WL 2521434, at *2 (Del. Ch. Aug. 9, 2006); *Envtl. Diagnostics, Inc. v. Disease Detection Intern., Inc.*, 1988 WL 909658, at *3 (Del. Ch. July 15, 1988) (Allen, C.); *RB Assocs. of N.J., L.P. v. Gillette Co.*, 1988 WL 27731, at *2 (Del. Ch. Mar. 22, 1988) (Allen, C.); *Shamrock Assocs. v. Tex. Am. Energy Corp.*, 517 A.2d 658, 661 (Del. Ch. 1986); *Weiss v. Anderson, Clayton & Co.*, 1986 WL 5970, at *4 (Del. Ch. May 22, 1986) (Allen, C.).

One petitioner was Lucie Senouf. Before the merger, she held 10,441 shares in an account with Drexel Burnham Lambert Incorporated, which in turn held them through DTC. The other petitioner was Margaret Earle. Before the merger, she held 20,000 shares in an account with Prudential-Bache Securities Inc., which in turn held them through DTC. Neither Senouf nor Earle caused Cede to make an appraisal demand. An individual named Mr. Champy made the demand for Senouf. Prudential-Bache made a demand for Earle. Enstar argued that neither petitioner had validly perfected appraisal rights and was not entitled to participate in the settlement.

Senouf and Earle sought to take advantage of the settlement, and the case went to trial before then-Vice Chancellor, later Justice Hartnett. The petitioners did not argue that, by virtue of the depository system and the DTC participant list, Drexel and Prudential-Bache should be considered stockholders of record. Instead, they contended that the disclosures in Enstar's proxy statement did not accurately describe the role of DTC and Cede and misleadingly stated that "[a] record holder *such as a broker* who holds Common Shares . . . as nominee for beneficial owners . . . must exercise appraisal rights on behalf of such beneficial owners . . . ." *Enstar I*, 1986 WL 8062, at *4 (emphasis added).

Vice Chancellor Hartnett held that on the facts presented, Senouf and Earle had satisfied the Record Holder Requirement. He described the depository system in some detail, although predominantly as a voluntary choice by brokers. To get the flavor, it is worth quoting his description at length:

39

CEDE & Co. is a partnership used by The Depository Trust Company as its nominee to hold securities for its participants—all of which are brokerage firms, banks and other financial institutions. Neither The Depository Trust Company nor CEDE & CO. hold any shares for themselves but only hold shares as nominees for the participants in The Depository Trust Company. At the time of the merger CEDE & Co. was listed on the books of ENSTAR as holding over 7 million shares of its stock and there was no breakdown on the books of ENSTAR of the actual beneficial ownership of the CEDE holdings.

The use of CEDE & Co. and similar central security depositories to hold shares for stockbrokers, which shares are in turn held by the stockbrokers for their customers, has emerged as a major, if not dominant, method for the holding of shares of publicly traded corporations. The function performed by the central security depositories is to provide a central facility for the storage of enormous numbers of stock certificates and to provide a means for the transfer of shares without the actual transfer of certificates.

* * *

The publicly held corporations are well aware of the system and it is obviously to their advantage to have their shares held by central security depositories because this aids capital formation and it relieves the corporation of the paperwork which would be required if every owner of a share of stock had his shares listed in his own name on the books of the corporation.

*Id.* at *1-2.

Vice Chancellor Hartnett contrasted the petitioners' knowledge about Cede with what Enstar knew. In short, he found that neither Senouf nor Earle knew that her broker was a DTC participant or that her shares were registered in Cede's name. By contrast, there was

no question that ENSTAR knew that a large number of its shares were held in the name of CEDE . . . and that CEDE . . . was a nominee used by [DTC] which in turn held the shares for [its] participants—stock brokerage firms, banks and other financial institutions which in turn held them for their customers, the actual beneficial owners.

*Id.* at *2. He also discussed the Cede breakdown, finding that

ENSTAR received a monthly breakdown from [DTC] of all the shares held in CEDE['s] name which showed the name of the stock broker, etc., for whom the shares were being held and which purportedly listed the number of shares held for each broker. ENSTAR was also entitled to receive, on request, supplementary lists.

*Id.* At the time of the merger, Enstar knew from participant list that Cede "held 379,268 shares for customers of Prudential-Bache and 40,169 shares for customers of Drexel-Burnham Lambert." *Id.* Vice Chancellor Hartnett stressed that despite knowing about Cede, Enstar's proxy materials made no mention of it.

Vice Chancellor Hartnett ultimately resolved the case on equitable grounds. He concluded that

[w]hen the totality of the circumstances present here are considered, it is clear that ENSTAR had reasonable constructive notice that Mrs. Earle's and Mrs. Senouf's shares were listed on the corporation records under the name "CEDE & CO." and that its refusal to permit Mrs. Earle and Mrs. Senouf to receive the settlement consideration [provided to appraisal claimants] is based on impermissible hypertechnicalities.

*Id.* at *7. He thus ordered Enstar to pay the settlement consideration to the petitioners.

Enstar appealed, and the Delaware Supreme Court reversed. The high court viewed the case as a traditional dispute involving beneficial holder status, rather than a new scenario resulting from the depository system. The high court thus relied predominantly on existing precedent, such as *Salt Dome*, and subsequent cases interpreting the statutory language of the Record Holder Requirement. *Enstar II*, 535 A.2d at 1354. The court also observed that requiring record holder status was consistent with cases interpreting of other sections of the DGCL, including 8 *Del. C.* § 219(c), and that the rule was "harmonious with the Uniform Commercial Code," which permits a

corporation to "treat the *registered owner* as the person *exclusively* entitled to vote, to receive notifications and otherwise to exercise all the rights and powers of an owner." *Id.* (emphasis in original) (quoting 6 *Del. C.* § 8-207(1)). The court does not appear to have been presented with the argument that by virtue of the DTC participant list, Drexel and Prudential-Bache should have been considered registered owners.

Although the Delaware Supreme Court touched on the practice of holding through DTC, the high court did not consider the origins of the requirement or the overlay of federal law. The Supreme Court regarded DTC as simply a new form of doing business, observing that that "[t]he use of security depositories by brokerage firms now is a common practice." *Id.* Of particular note, the court commented that "[t]he decision [to use DTC] is a matter which is strictly between the broker and its clients." *Id.* As support for this proposition, the Supreme Court cited the testimony of Mr. Karasek, an employee of Prudential-Bache who signed the appraisal demand for Earle. He had testified that

> [i]f the client wants their (sic) stock in street name, then Prudential–Bache will buy the securities for the client ...; the client has determined she wants it in street name. That's how it's done.
>
> * * *
>
> The choice is up to the client.

*Id.* (alterations in original). Reflecting on Mr. Karasek's testimony and citing Delaware cases pre-dating share immobilization, the high court commented that "[i]n making that choice [*i.e.,* the choice to hold in street name], the burden must be upon the stockholder to obtain the advantages of record ownership. The legal and practical effects of having one's stock registered in street name cannot be visited upon the issuer. The attendant

42

risks are those of the stockholder, and where appropriate, the broker." *Id.* (citations omitted).

Later in the decision, the Supreme Court reiterated its view that Cede's role in the case resulted from a private decision made by the petitioners and their brokers:

> Here, the problem is one between the plaintiffs and their brokers. Enstar cannot, and should not, be blamed for the failure of a nominee or broker to correctly perfect appraisal rights for a beneficial owner. Several other brokers properly instructed CEDE & Co. to demand an appraisal on behalf of their customers. The failures of Prudential–Bache or Drexel in that regard should not be shifted to, or borne by, Enstar. The dispute, if any, is between these brokers and their clients.

*Enstar II*, 535 A.2d at 1355. Elsewhere, the Supreme Court quoted at length from *Salt Dome* and held:

> Thus, in the interest of promoting certainty in the appraisal process . . ., a valid demand must be executed by or on behalf of the holder of record, whether that holder is the beneficial owner, a trustee, agent or nominee. Any other result would embroil merging corporations in a morass of confusion and uncertainty, none of which was of their making.

*Id.* at 1356.

Finally, the Delaware Supreme Court rejected the argument that Enstar's disclosures about perfecting appraisal rights were misleading. The high court held that the disclosures gave proper instructions for perfecting appraisal rights and that "the relationship between a beneficial stockholder and a nominee are not relevant matters of concern to the merging corporations." *Id.* at 1357.

In my view, the Delaware Supreme Court's decision in *Enstar II* reflected incorrect assumptions about the depository system. First, *Enstar II* assumed that custodial banks and brokers freely chose to move to the depository system for their own

convenience.[14] To the contrary, the depository system was a necessary response to the late 1960s paperwork crisis and embodied in a federal mandate. The *Enstar II* court similarly treated the holding of shares through depositaries as something that is optional for end-users, *i.e.*, actual investors. While it is true theoretically that any particular investor could opt out of the depository system and chose to hold in record name,[15] only a few could do so before the system would break down. Just as some individuals can choose not to receive vaccinations and free ride on the immunity of the group, so too can a small minority of stockholders elect to hold shares directly. But without widespread

---

[14] *See Enstar II*, 535 A.2d at 1354 ("The decision [to use DTC] is a matter which is strictly between the broker and its clients."). Other Delaware decisions during this period reflected the same assumption. *See, e.g., RB Assocs.*, 1988 WL 27731, at *3 (describing DTC system as a "mechanism of convenience for the brokerage firms"); *Olson*, 1985 WL 11575, at *3 (describing Cede as "but a name used for the convenience of the brokerage houses"); *Hatleigh*, 428 A.2d at 353 (remarking that DTC exists "for the benefit of those firms participating in the Depository Trust Company so as to simplify their stock transfer transactions on behalf of their customers"); *Giovanini*, 1979 WL 178568, at *1 (describing Cede as a "mechanism of convenience for the brokerage firms").

[15] *See, e.g.*, 6 *Del. C.* § 8-508 ("A securities intermediary shall act at the direction of an entitlement holder to change a security entitlement into another available form of holding for which the entitlement holder is eligible, or to cause the financial asset to be transferred to a securities account of the entitlement holder with another securities intermediary."); *id.* cmt. 1 ("If security certificates in registered form are issued for the security, and individuals are eligible to have the security registered in their own name, the entitlement holder can request that the intermediary deliver or cause to be delivered to the entitlement holder a certificate registered in the name of the entitlement holder or a certificate indorsed in blank or specially indorsed to the entitlement holder . . . . If the security can be held by individuals directly in uncertificated form, the entitlement holder can request that the security be registered in its name."); *see also* 8 *Del. C.* § 158 ("Every holder of stock represented by a certificate shall be entitled to have a certificate . . . representing the number of shares registered in certificate form.").

participation in the depository system, securities markets would again drown in paperwork. The system was imposed by Congress and the SEC, and almost-universal participation is a *de facto* requirement.

Second, *Enstar II* assumed that the depository system imposes only costs on issuers and yielded them no benefits.[16] Yet by the time of the *Enstar II* decision, the depository system was what enabled public trading of securities to take place. Issuers could not undertake an initial public offering or otherwise access the equity markets without depository ownership. Being able to raise capital through the public markets is an obvious benefit to issuers. So is avoiding the costly paperwork burdens that previously brought the markets to a stop. *See* Part I.A., *supra.* These benefits have only grown more profound since *Enstar II*.

Third, *Enstar II* reiterated the *Salt Dome* decision's concern about the uncertainty and practical difficulties a Delaware corporation would face in identifying its stockholders if asked to look beyond the stock ledger. With the Cede breakdown, those concerns do not exist. When *Enstar II* was written, a Cede breakdown could be obtained easily, and it provided a reliable listing of the depository institutions that held through

---

[16] *See Enstar II*, 535 A.2d at 1353 n.2 ("Whether a beneficial stockholder participates in a depository system is a matter between the beneficial stockholder and his broker, and is not a consideration for issuers."); *accord Wynnefield P'rs Small Cap Value L.P. v. Niagara Corp.*, 2006 WL 1737862, at *3 (Del. Ch. June 19, 2006) (same), *rev'd on other grounds*, 907 A.2d 146 (Del. 2006) (ORDER); *Am. Hardware Corp. v. Savage Arms Co.*, 136 A.2d 690, 692 (Del. 1957) ("If an owner of stock chooses to register his shares in the name of a nominee, he takes the risks attendant upon such an arrangement . . . .").

DTC. Today, it is even easier to obtain a Cede breakdown, and because trades are now tracked in real time rather than awaiting an end-of-the-day netting-out process, the list is even more accurate.

Finally, *Enstar II* asserted at several points that the nominee relationship was not a matter of concern for the merging corporation.[17] That is not accurate either. Under federal law, the corporation whose stockholders would vote on the merger—and who could be eligible for appraisal rights—must go through DTC to identify its custodian banks and brokers for purposes of mailing out proxy materials. The issuer cannot ignore DTC and pretend that Cede is a single holder of record.

Notably, *Enstar II* did not address whether DTC participants should be regarded as record holders for purposes of Delaware law, as they are for federal law. No one seems to have made the argument, and neither court considered it. Although *Enstar II* seems to have collapsed the distinction between the broker level of beneficial ownership and the depository level, it did so on the assumption that the pertinent legislative facts had not changed since *Salt Dome*.[18]  In my view, that was misguided.

---

[17] *Enstar II*, 535 A.2d at 1354 ("The legal and practical effects of having one's stock registered in street name cannot be visited upon the issuer. The attendant risks are those of the stockholder, and where appropriate, the broker."); *id.* at 1355 ("Here, the problem is one between the plaintiffs and their brokers. Enstar cannot, and should not, be blamed for the failure of a nominee or broker to correctly perfect appraisal rights for a beneficial owner . . . . The dispute, if any, is between these brokers and their clients.")

[18] The concept of "legislative facts" refers to the empirical assumptions about the world that courts necessarily make when deciding cases. *See In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 940 (Del. Ch. 2003) (Strine, V.C.) (deploying concept and citing Kenneth Culp Davis, *An Approach to Problems of Evidence in the Administrative*

*Enstar II* does appear to have regarded construing the Record Holder Requirement as an appropriate exercise of judicial authority. As I see it, the question of whether DTC participants should be regarded as holders of record remains open for the Delaware Supreme Court to decide, should it wish to do so.

### 6. The Rise Of Appraisal Arbitrage

The most recent decisions to consider the role of DTC have involved the practice of appraisal arbitrage, a strategy in which investors purchase shares in order to pursue appraisal. In *Transkaryotic*, this court held that funds who bought shares after the record date for a merger could seek an appraisal for the shares purchased after the record date, without having to show that the shares were not voted in favor of the merger. 2007 WL 1378345, at *3. Subsequent decisions have followed *Transkaryotic*.[19]

The outcome in *Transkaryotic* turned on the role of Cede as the omnibus holder of record. On the record date for the merger, Cede held 29,720,074 shares. Acting in accordance with the instructions of its participants, Cede voted 12,882,000 shares in favor of the merger, leaving 16,838,074 shares eligible for appraisal. The petitioners beneficially owned 2,901,433 shares on the record date and acquired another 8,071,217 shares after the record date. They sought appraisal for all 10,972,650 shares, which was

*Process*, 55 Harv. L. Rev. 364, 402-403 (1942)). *See generally* Leo E. Strine, Jr., *The Inescapably Empirical Foundation of the Common Law of Corporations*, 27 Del. J. Corp. L. 499, 502-503 (2002) (describing concept at greater length).

[19] *See, e.g., Merion Capital LP v. BMC Software, Inc.*, 2015 WL 67586 (Del. Ch. Jan. 5, 2015); *Ancestry.com*, 2015 WL 66825.

less than the total number of appraisal-eligible shares. This court regarded that fact as dispositive because under *Olivetti*, "the actions of the beneficial holders are irrelevant," and only "the record holder's actions determine perfection of the right to seek appraisal." *Id.* at *4, *3. Elaborating, the court explained that

> [t]he issue here mirrors that in *Olivetti* . . . . [Transkaryotic] seeks to examine relationships between Cede (the record holder) and certain non-registered, beneficial holders in order to determine the existence of appraisal rights. But the Supreme Court has already deemed this relationship to be an improper and impermissible subject of inquiry in the context of an appraisal. The law is unequivocal. A corporation need not and should not delve into the intricacies of the relationship between the record holder and the beneficial holder and, instead, must rely on its records as the sole determinant of membership in the context of appraisal.

*Id.* at *4.

In my view, the rise of appraisal arbitrage suggests the need for a more realistic assessment of the depository system that looks through Cede to the DTC participants. But first, a caveat: Looking through DTC would not eliminate the ability of appraisal petitioners to seek appraisal for shares acquired after the record date, which is an outcome that opponents of appraisal arbitrage frequently advocate. As to that possibility, it is not clear to me why the law should treat a stockholder's right to seek an appraisal differently than how it treats other legal rights. An appraisal claim is simply a chose in action. As such, the claim passes with the shares.[20] In a market economy, the ability to

_____

[20] *See generally In re Activision Blizzard Inc. S'holder Litig.*, ___ A.3d ___, 2015 WL 2438067, *13-25 (Del. Ch. May 21, 2015). Choses in action are transferrable under Delaware law when they are the types of claims that would survive the death of the transferor and pass to his personal representative. *See Indus. Trust Co. v. Stidham*, 33 A.2d 159, 160-61 (Del. Super. 1942). By statute in Delaware, "[a]ll causes of action,

48

transfer property, including intangible property, is generally thought to be a good thing; it allows the property to flow to the highest-valuing holder, thereby increasing societal wealth. For creditors, the ability to sell a bundle of property rights that the buyer can enforce is unquestioned. When a creditor assigns a loan, even one in default, the right to enforce the loan passes to the new holder. No one objects that the assignee purchased a lawsuit. It is not apparent to me why a right held by the equity side of the capital structure should be treated differently, particularly when the right to bring an appraisal proceeding has been compared by the Delaware Supreme Court to a debt collection action.[21] Consequently, no one should view my arguments in favor of looking through DTC as a way to eliminate appraisal arbitrage entirely—itself a debatable policy goal.[22] Custodial

---

except actions for defamation, malicious prosecution, or upon penal statutes, shall survive. . . ." 10 *Del. C.* § 3701.

[21] *See Salt Dome*, 41 A.2d at 588. Indeed, even the right to control how shares vote transfers with the shares, notwithstanding the legal expedient of the record date, because the subsequent holder can compel the seller to issue him a proxy (assuming the seller can be identified). *Commonwealth Assocs. v. Providence Health Care, Inc.*, 641 A.2d 155, 158 (Del. Ch. 1993) (Allen, C.); *In re Giant Portland Cement Co.*, 21 A.2d 697, 701 (Del. Ch. 1941); *In re Canal Constr. Co.*, 182 A. 545, 547-48 (Del. 1936) (Wolcott, Jos., C.); *Italo Petroleum Corp. of Am. v. Producers' Oil Corp. of Am.*, 174 A. 276, 280 (Del. Ch. 1934) (Wolcott, Jos., C.).

[22] Strong arguments can be made that appraisal represents a more rational and efficient alternative to traditional fiduciary duty litigation. *See* Charles R. Korsmo & Minor Myers, *Competition and the Future of M&A Litigation*, 100 Iowa L. Rev. Bull. 19, 25-28 (2015); Charles R. Korsmo & Minor Myers, *Appraisal Arbitrage and the Future of Public Company M&A*, 92 Wash U. L. Rev. (forthcoming 2015); Charles Korsmo & Minor Myers, *The Structure of Stockholder Litigation: When Do The Merits Matter*, 75 Ohio State L.J. 829, 859-67 (2014). At one point, the Delaware Supreme Court appeared to prioritize appraisal over fiduciary duty litigation by holding that "a plaintiff's monetary remedy [following a merger] ordinarily should be confined to the more liberalized

banks and brokers still could buy shares after the record date and seek appraisal for those shares. And of course, even under a regime that denied appraisal rights to shares purchased after the record date, investors still could accumulate large appraisal-eligible stakes between the time of deal announcement and the record date. *See Salomon Bros. Inc. v. Interstate Bakeries Corp.,* 576 A.2d 650, 654 (Del. Ch. 1989) (finding "nothing inequitable about an investor purchasing stock in a company after a merger has been announced with the thought that, if the merger is consummated on the announced terms, the investor may seek appraisal").

Nevertheless, in my view, looking through Cede to the DTC participants would be an improvement. Under the appraisal statute, a record holder is only supposed to be able to seek appraisal for shares (i) owned on the date of statutorily compliant demand for appraisal, (ii) held continuously through the effective date of the merger, and (iii) not voted in favor of the merger. *Ancestry.com*, 2015 WL 66825, at *4. Taken together, Cede's dominant holdings and the current one-size-fits-all interpretation of the Record Holder Requirement prevent courts from applying these requirements effectively. Cede owns too many shares, and with share immobilization, ownership does not change.

---

appraisal proceeding herein established." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 714 (Del. 1983). That promise did not survive the decisions in *Rabkin v. Philip A. Hunt Chemical Corp.*, 498 A.2d 1099 (Del. 1985), and *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182 (Del. 1988). *See generally Andra v. Blount*, 772 A.2d 183, 192 (Del. Ch. 2000) (Strine, V.C.) (explaining that *Rabkin* and *Cede* effectively overruled the appraisal-as-basic-remedy aspect of *Weinberger*).

By contrast, if the focus were to move beyond Cede, it should be possible to develop a more nuanced jurisprudence. The number of shares held by banks and brokers does change, and those changes may have legal salience. Or situations may arise that lend themselves to specific rulings, such as if a broker acquires a large block of shares after the record date in a negotiated transaction. In that case, the seller should be readily identifiable, and it should be an easy matter to determine how the shares were voted. The federal securities laws require that banks and brokers obtain voting instructions from their clients, and banks and brokers satisfy this requirement by sending out voting instruction forms. *See generally* Keir D. Gumbs et al., *Debunking the Myths Behind Voting Instruction Forms and Vote Reporting*, 21 Corp. Gov. Adv. 1 (July/Aug. 2013). It also may be possible to use voter instruction forms for other purposes, such as confirming whether or not particular shares held by an appraisal claimant on the record date were voted in favor of the merger. And as this case shows, there also may be records at the broker level which, if examined, would allow the courts to apply other statutory limitations more accurately. We already make these types of distinctions when dealing with the right to vote, which was the principal right relied on by analogy in *Salt Dome* for the creation of the Record Holder Requirement.[23] Under this more flexible approach, the

---

[23] *See, supra,* n.19 (citing cases in which court permitted post-record date acquirer of shares to determine how shares were voted, notwithstanding legal ownership on stock list); *Preston v. Allison*, 650 A.2d 646, 649 (Del. 1994) (looking through name of registered holder on stock list and recognizing voting rights of beneficial owners where form of ownership was mandated by federal law); *Sutter Opportunity Fund 2 LLC v. Cede & Co.*, 838 A.2d 1123, 1129 (Del. Ch. 2003) (permitting issuer to look through Cede for purposes of analyzing whether proponents of a proposal for a matter to be

corporation "generally is entitled to rely on its own stock list," but the list is not conclusive; questions of ownership and the ability to exercise associated rights can be the subject of proof. *Preston*, 650 A.2d at 649.

It would have been preferable, in my view, to begin developing this case law in 2010. *See Kurz*, 989 A.2d at 174 (arguing that treating DTC participants as holders of record could help "[r]educ[e] the number of shares available for appraisal arbitrage"). Yet the need for a more flexible approach has not gone away. Looking through Cede is obviously imperfect, but until share tracing becomes possible, the perfect should not be the enemy of the good. Viewed pragmatically, looking through Cede to the custodial banks and brokers on the participant list merely returns Delaware law to the state in which it existed before the federal policy of share immobilization, restoring the conditions that prevailed when *Salt Dome* was written and later when the Record Holder Requirement was codified.

---

submitted to a vote met a 10% minimum threshold in partnership agreement); *Seidman & Assocs., L.L.C. v. G.A. Fin., Inc.*, 837 A.2d 21, 29 (Del. Ch. 2003) (same); *In re Ne. Water Co.*, 38 A.2d 918, 923 (Del. Ch. 1944) (treating statutory reference to stockholder status being determined by name on stock list as "a limited but practical rule of evidence for the ready ascertainment of persons entitled to notice of and to vote at a stockholders' meeting" but not dispositive in all cases); *In re Diamond State Brewery, Inc.*, 2 A.2d 254, 257 (Del. Ch. 1938) (Wolcott, Jos., C.) ("The court is not bound in a review proceeding [of an election] by the showing of stockholders made on the corporation's books."); *cf. Rainbow Navigation, Inc. v. Pan Ocean Navigation, Inc.*, 535 A.2d 1357, 1359 (Del. 1987) ("We now hold that when the stock ledger is blank or non-existent, the Court of Chancery has the power to consider other evidence to ascertain and establish stockholder status.").

## III.    CONCLUSION

Under current law, Dell's motion for summary judgment must be granted. The Funds lost their appraisal rights when their shares were re-titled in the names of their custodial banks' nominees. Were it up to me, I would hold that the concept of a "stockholder of record" includes the custodial banks and brokers on the DTC participant list. But given existing precedent, I believe that only the Delaware Supreme Court can change how our case law interprets the Record Holder Requirement. This court obviously has no ability to tell the Delaware Supreme Court what to do. This decision has attempted only to present the reasons why one trial judge believes that a different approach would be superior.